UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                                  Case No.: 16-cr-20229
v.                                               Honorable Gershwin A. Drain

D-2 MARVIN LAMONT JENKINS,

      Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [#52, #53, #72 AND #73]

**I. INTRODUCTION**

On March 31, 2016, the grand jury returned an Indictment against Defendant Marvin Jenkins, charging him with violations of 21 U.S.C. §§ 841(a)(1) and 846; conspiracy to possess with intent to distribute cocaine, Count I; aiding and abetting possession with intent to distribute cocaine, Count II; and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), Count III.

Presently before the Court is Defendant's Motion to Suppress Evidence. This matter is fully briefed and an evidentiary hearing was held on May 18, 2017,

and oral argument occurred on May 19, 2017. For the reasons that follow, the Court will deny Defendant's Motion to Suppress Evidence.

## II.     FACTUAL BACKGROUND

On March 1, 2016, the Detroit office of the Drug Enforcement Administration ("DEA") received information from the DEA office in Chicago that Jorge Duarte was a narcotics broker who facilitated cocaine transactions in Detroit, Michigan. This information was obtained by a Source of Information ("SOI"), who indicated that Duarte travels to Detroit via an Amtrak train, counts narcotics proceeds in a hotel, and when finished, telephones a truck driver and informs the driver to deliver cocaine to the customer. The truck driver then meets with the customer to supply the cocaine. The SOI also provided the DEA with Duarte's cellular telephone number. When shown Duarte's Facebook page by the Chicago DEA agents, the SOI confirmed the photograph on the main page was Duarte. On the "timeline" of Duarte's Facebook page, Duarte "checked-in" at the Holiday Inn Express and Suites in Southfield, Michigan on February 11, 2016.

At the evidentiary hearing, Sergeant Dean Caldwell of the Wixom Police Department testified. In March of 2016, Caldwell was assigned as a Task Force Officer assisting the DEA. He testified that once the tip came in from Chicago, the DEA obtained an administrative subpoena to ping Duarte's cellular phone, which

allowed the DEA to observe the location of his phone. They watched Duarte's phone follow the Amtrak tracks traveling to Detroit. The agents contacted a liaison with Amtrak and confirmed that Duarte was traveling on the train destined for Detroit.

Thereafter, the DEA set up surveillance at the Detroit Amtrak station. On March 5, 2016, Duarte was observed arriving at the Amtrak station. Duarte entered a Ford-150 driven by Defendant. The agents ran the plates on the Ford-150 and discovered that the vehicle was a rental. An administrative subpoena was served on the rental car company, and its records revealed that Defendant rented the vehicle on March 1, 2016, with a return date of March 8, 2016.

The DEA surveillance team followed Defendant's vehicle to a Holiday Inn Express and Suites on Northwestern Highway in Southfield, Michigan. This is the same hotel Duarte "checked in" at on his Facebook page on February 11, 2016. Defendant entered the hotel. The DEA served the hotel with a subpoena and its records revealed that Defendant paid cash to reserve room 230 for March 5, 2016, and March 6, 2016. Defendant remained in the hotel for ten minutes before returning to his vehicle and leaving the property. Thereafter, the DEA set up constant surveillance at the hotel.

On March 6, 2016, Defendant was observed arriving back at the hotel in the F-150. He removed a black duffle bag with gray accents from the vehicle before

entering the hotel room. Defendant remained in the hotel room for twelve minutes before leaving. Before he left the hotel, Defendant stopped at the front desk and paid cash to extend room 230 for an additional night, or until March 7, 2016. While Defendant was in the hotel, the DEA placed a tracking device on his vehicle.

After the Defendant left the hotel, he was observed meeting with an individual identified as Julian Watkins. The DEA already knew of Watkins, who is a large scale narcotics trafficker in the metro Detroit area. Watkins and Defendant proceeded to Monica Street in Detroit. They parked their vehicles next to each other facing opposite directions. Watkins was then seen walking away from the back side of the F-150 before both vehicles left the location. The vehicles were then observed parked near each other on Pennington Drive in Detroit. Watkins stood near the open passenger door of the F-150. After one minute, Watkins was observed closing the rear passenger door of the Defendant's vehicle. Defendant left the location. The DEA terminated its surveillance at this point because Defendant appeared to be engaged in counter-surveillance techniques.

Later that day, Defendant was seen arriving at the Holiday Inn. He removed a large, heavy duffle bag from the rear passenger side of the F-150. He wheeled the duffle bag into room 230. Fifteen minutes later, Defendant and Duarte exited the hotel and departed in the F-150. They traveled to a gas station in Southfield

and put gas in the truck. Thereafter, they drove to a Travel Centers of America Truck Stop, roughly forty-four miles away, located in Dexter, Michigan. Defendant parked his truck next to a semi-truck parked in the back of the parking lot. The semi-truck had California plates. After approximately fifteen minutes, the F-150 departed the area and returned to the Holiday Inn. Duarte entered the hotel and Defendant left the hotel parking lot. The DEA requested a traffic stop of the F-150.

At the evidentiary hearing, Sergeant Caldwell testified that the Southfield Police Department's police officers had been briefed on the ongoing narcotics investigation. They were informed of the SOI information and of the DEA observations up to that point. They also had access to the DEA's radio so they could overhear developments in the investigation of Duarte and Defendant.

Southfield Police Officer Kory Karpinsky also testified at the evidentiary hearing on May 18, 2017. Karpinsky was assigned to road patrol and to assist the DEA on March 6, 2016. He was given a radio so that he could directly communicate with the DEA agents. He was told to be on stand-by and to assist the DEA with its investigation.

Karpinsky responded to the DEA request for a stop of the F-150. He was told that the DEA did not want to alert Defendant that he was under investigation by the DEA. Once Karpinsky spotted the F-150 stopped at a traffic light at the

intersection of Ten Mile Road and Evergreen Road, he observed the Defendant commit three civil infractions. He made an improper right hand turn from the through lane rather than the turn lane when turning onto Ten Mile Road; he failed to signal when turning onto Northwestern Highway from Ten Mile Road; and exceeded the speed limit while on Northwestern Highway. Conversely, Defendant maintains in his pleadings that he did not violate any traffic laws. He asserts that Karpinsky's vehicle was located in front of the F-150, thus Karpinsky could not have seen Defendant commit the purported traffic violations as he claims.

Karpinsky activated his lights and stopped the vehicle. Karpinsky testified that Defendant appeared extremely nervous. In Karpinsky's view, Defendant was more anxious than the typical person who is stopped by police. The Defendant advised Karpinsky that he had a concealed weapons permit and had a gun in his car. When Karpinsky asked the Defendant why he was so nervous, the Defendant claimed that he was diabetic and showed Karpinsky some medication he had in his vehicle, but the medication was prescribed to someone else. The Defendant further informed Karpinsky that he had just left his father's house. However, Karpinsky knew this was false because he could hear the ongoing developments of the investigation on his police radio and knew that Defendant had just left the Holiday Inn.

After talking to the Defendant, Karpinsky called for backup and a canine

unit. Thereafter, Michigan State Trooper Birmingham arrived with his trained canine. When Defendant was asked to exit the vehicle, he became argumentative, attempted to hide the ignition key, locked the door and attempted to shut it. Karpinsky testified that Defendant became louder and louder and Karpinsky felt Defendant was attempting to control the situation. Birmingham deployed his canine and received a positive alert on the exterior of the F-150. Birmingham conducted a search of the vehicle and discovered a large, black duffle bag which contained 31 individually wrapped packages of what was later determined to be approximately 28 grams of cocaine. Defendant was placed under arrest.

### III. LAW & ANALYSIS

#### A. The Traffic Stop

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). In order to withstand constitutional scrutiny, traffic stops must either be supported by probable cause that a civil infraction has occurred or by reasonable suspicion of an ongoing crime. *Id.* A police officer may legally stop a car when he has probable cause to believe that a civil traffic violation has occurred. *Id.* When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant. *Id.*

In his papers, Defendant asserts that he did not commit any traffic violations.

He further argues that Karpinsky manufactured the traffic violations to support the vehicle stop. Conversely, the Government contends that Karpinsky witnessed Defendant engage in improper lane use, turn without signaling and speed. These are all traffic violations under Michigan law. MICH. COMP. LAWS § 257.642(1); 257.648(1); 257.627.

At the evidentiary hearing, the Court was able to view the dash cam video from Karpinsky's patrol car. When the video begins, the F-150 is out of view. Thus, the video did not capture Defendant allegedly turning right onto Ten Mile from an improper lane. However, Karpinsky testified that he witnessed Defendant turn right onto Ten Mile Road from the through lane on Evergreen Road, rather than from the turn lane. Defendant did not impeach Karpinsky's testimony. Additionally, it is not clear from the video whether Defendant was traveling above the speed limit. Karpinsky testified that he believed the Defendant was speeding and that he was traveling above the speed limit in an effort to catch up to the F-150. Defendant likewise did not impeach Karpinsky's testimony with regard to the speeding violation. Accordingly, Karpinsky had probable cause to stop Defendant's vehicle.

However, even if Defendant had impeached Karpinksy's testimony concerning whether Defendant committed the civil infractions of improper lane use and speeding, the video shows Defendant failing to use his turn signal when he

turned onto Northwestern Highway from Ten Mile Road. Therefore, there was probable cause to stop Defendant's vehicle based on his failure to use his turn signal.

In any event, even if the traffic stop was not supported by probable cause, it was still legal because Karpinsky had reasonable suspicion that Defendant was involved in drug trafficking. Under *Terry v. Ohio*, 392 U.S. 1 (1968), police may stop a motor vehicle if they have reasonable suspicion of an ongoing crime. Reasonable suspicion must be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id*. at 21-22. "[A]n inchoate and unparticularized suspicion or hunch of criminal activity" does not amount to reasonable suspicion. *United States v. Blair,* 524 F.3d 740, 750 (6th Cir. 2008) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

"Reasonable suspicion must be considered 'under the totality of the circumstances, considering all of the information available to law enforcement officials at the time.'" *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). Courts should consider "the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Id.*

In the instant case, the collective knowledge doctrine applies to the

reasonable suspicion analysis. The collective knowledge doctrine permits an officer to conduct a stop based on information obtained from fellow officers. *Id*. at 766. The collective knowledge doctrine "recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *Id*. Courts should evaluate whether (1) the officer taking the action acted in objective reliance on the information received; (2) the officer providing the information must have the facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *Id*. at 767 (citing *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010)).

This case appears to present facts similar to those in *Lyons*, where the court found officers were entitled to rely on the collective knowledge doctrine. *Lyons*, 687 F.3d at 766-69. In *Lyons*, the DEA had been investigating a large-scale prescription drug ring and Medicare fraud scheme for months. *Id*. at 758. The scheme involved a purported healthcare practice called Quick Response Medical Professionals (QRSMP), which recruited Medicare-eligible patients to submit to sham physical examinations with a doctor who would then write these patients a variety of prescriptions for controlled substances such as oxycodone, Vicodin, Xanax, and prescription cough syrup. *Id*. at 759. QRSMP retained the prescriptions, filled them, and distributed them for street sale. *Id*. The patients

were paid small amounts of money, about $150 to $200. *Id*. QRSMP billed Medicare for the fraudulent medical services. *Id*.

On the day of the *Lyons* defendant's arrest, DEA agents learned that a female driving a gray vehicle with out-of-state license plates was traveling to the target house, QRSMP's medical services location. *Id*. at 760. The DEA contacted the Michigan State Police to organize a traffic stop by a marked vehicle. *Id*. In concluding the collective knowledge doctrine applied, the *Lyons* court held that "the troopers possessed all the information they needed to act—a request by the DEA . . . that they execute the traffic stop in the expectation that illegal narcotics would be found in the vehicle." *Id*. at 768-69. "[T]he court's primary attention should remain on the investigating officer's actions and knowledge, rather than on the quantity or quality of information supplied to the responding officer." *Id*. at 769.

Here, Karpinsky was asked by the DEA to stop Defendant. Like the facts in *Lyons*, the DEA had been investigating Defendant and his co-defendant, Duarte, for narcotics trafficking. The DEA received a tip from an SOI that Duarte was involved in a large scale drug transaction, the details of which were independently corroborated during the course of the investigation. The SOI conveyed that Duarte would travel from Chicago to Detroit via an Amtrak train to count money for a drug supplier at a hotel before contacting a truck driver, who would then meet to

11

turn narcotics over to the customer. All of the information discovered through the course of the DEA's investigation was conveyed to the Southfield Police Department's officers, including Karpinsky, who was assigned to be on standby to assist in any way he could with the investigation.

As such, through the collective knowledge of the officers conducting the investigation of Duarte and Defendant, Karpinsky knew that Duarte was staying at a hotel rented by Defendant and that Duarte was a narcotics broker who facilitated drug transactions in Detroit, Michigan. He further was aware that Defendant and Duarte were observed leaving the hotel and traveling to meet a semi-truck, which they met for a fifteen minute period. Prior to traveling to meet the semi-truck, Defendant was seen carrying a large, black duffle bag, as well as meeting with Watkins, an individual known to officers as a large scale narcotics dealer in the Detroit area. Defendant rented the F-150 and the hotel room with cash. All of this activity is consistent with drug trafficking, thus Karpinsky had reasonable suspicion that there were narcotics in Defendant's vehicle.

Defendant argues that the officers never witnessed him engage in any criminal activities. He claims that all of his activities are consistent with innocent behavior, thus there was no reasonable suspicion that he was involved in drug trafficking. However, the aggregation of Defendant's activities, each with a potentially innocent explanation, can amount to reasonable suspicion. *United*

*States v. Harris*, 192 F.3d 580 (6th Cir. 1999). Officers are entitled to "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.*" United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Defendant's reliance on *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008) is misplaced. In *Blair*, the Court ruled that the officer who made the traffic stop acted independently because it was never communicated that Blair should be stopped at all. *Id.* at 752. Unlike *Blair*, Karpinksy was directed to stop the F-150 to assist the DEA in an investigation. Based on the totality of the circumstances, the collective knowledge doctrine applies here. The DEA had reasonable suspicion that Defendant was involved with narcotics trafficking based on its investigation of Duarte and Defendant. Karpinsky was entitled to rely on the DEA agents' collective knowledge, and he therefore likewise had reasonable suspicion that Defendant was involved in drug trafficking.

**B. The Vehicle Search**

Additionally, contrary to Defendant's argument, Karpinksy's observations of Defendant, as well as the collective knowledge gained through the DEA's investigation provided probable cause to search the vehicle. *United States v. Perkins*, 994 F.2d 1184 (6th Cir. 1993) (holding that probable cause may be established through the collective knowledge of all officers). The Government

further maintains that Karpinsky had probable cause to search the F-150 independent of the collective knowledge doctrine, because a canine sniff revealed the vehicle contained narcotics. However, because the Court concludes that probable cause existed to search Defendant's vehicle based on the collective knowledge doctrine, the Court need not reach this issue.

"Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.' The test for probable cause is simply whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995). Probable cause "does not demand any showing that [the officer's] belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1982).

In *Lyons*, the court concluded that the automobile exception applied. *Id*. at 769-70. The *Lyons* defendant appeared very nervous and was uncooperative when he was initially stopped and questioned by the officer. *Id*. at 770. The *Lyons* court held that the officer's "observations, considered in their totality along with the facts that permitted the initial stop, established probable cause to search the minivan for controlled substances under the automobile exception." *Id.*

Similar to the facts in *Lyons*, when Karpinsky stopped the F-150, he observed Defendant act uncooperative and nervous. He also was aware that

Defendant was not being truthful when he claimed to have just left his father's home and when he stated he was a diabetic and showed Karpinsky medications that were supposedly for his condition, yet the medications were not prescribed to him. These observations, coupled with the facts that permitted the original stop pursuant to the collective knowledge doctrine, established probable cause to search the F-150 for narcotics.

**IV. CONCLUSION**

Based on the foregoing considerations, Defendant's Motion to Suppress Evidence is [#52, #53, #72, #73] DENIED.

SO ORDERED.

Dated: May 25, 2017 /s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 25, 2017, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk