UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

                                  Case No.: 16-cr-20229
v.                                Hon. Gershwin A. Drain

MARVIN LAMONT JENKINS,

          Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE [#122]

### I.      INTRODUCTION

On May 28, 2020, Defendant Marvin Lamont Jenkins filed a Motion for Compassionate Release. ECF No. 122.  Defendant is currently serving a 13-year sentence for possessing 24 kilograms of cocaine with the intent to distribute. Defendant seeks compassionate release due to the COVID-19 virus, his comorbidities – Type II diabetes and obesity, and his place of confinement, FCI Elkton, which has been particularly hard hit by the virus.

The Court appointed counsel, who has submitted a supplemental brief in support of Defendant's request for compassionate release.  The Government filed a Response in Opposition. Defendant's counsel also submitted a second

supplemental brief.  Upon review of the parties' briefing and the exhibits attached thereto, the Court concludes that oral argument will not aid in the disposition of this matter.  Accordingly, the Court will decide Defendant's Motion for Compassionate Release on the briefs.  *See* E.D. Mich. L. Cr. R. 12.1(a); E.D. Mich. L.R.  7.1(f)(2).   For the reasons that follow, the Court will deny Defendant's Motion for Compassionate Release.

## II.     FACTUAL BACKGROUND

On March 31, 2016, the grand jury returned a three-count Indictment against Defendant charging him with conspiracy to possess with intent to distribute cocaine; possession with intent to distribute cocaine; and possession of a firearm in furtherance of a drug trafficking crime.  Defendant appeared in this district and was released on bond pending trial.

The conduct giving rise to the charges involved Defendant acting as an intermediary to facilitate large scale cocaine trafficking from a Mexican source of supply to drug traffickers in Detroit, Michigan.  Defendant negotiated the price per kilogram of bulk shipments and rented a hotel room for his Co-Defendant to count the money before the drugs were turned over.  The officers who stopped Defendant recovered 24 kilograms of cocaine in a duffle bag in the back seat of his car, along with a loaded handgun.  The hotel room rented by Defendant was also searched and $820,113.00 in cash, a money counter, heat sealer, and materials to package

2

the cash were discovered. Defendant admitted to officers that he did the same thing on two other occasions – December of 2015 and February of 2016 – which allowed him to earn $36,000.00 in three months through trafficking at least 72 kilograms of cocaine. Defendant also confessed to engaging in other drug transactions but did not provide further details to law enforcement.

On July 18, 2017, Defendant accepted an offer from the Government that allowed him to plead guilty to possession with intent to distribute at least five kilograms of cocaine, with a guideline range of 135 to 158 months and a Rule 11(c)(1)(C) agreed-upon sentence of 156 months, or 13 years imprisonment. *See* Fed. R. Crim. P. 11(c)(1)(C). Dismissal of the gun charge eliminated Defendant's exposure to a mandatory fifteen-year minimum sentence. On December 14, 2017, the Court sentenced Defendant to 13 years imprisonment. The Court permitted Defendant to surrender and he began serving his sentence at FCI Elkton on February 22, 2018. The Bureau of Prisons (BOP) estimates Defendant's release date is March 16, 2029.

Defendant is a forty-year old African American male. Prior to his incarceration, Defendant worked as an operator at Ford Motor Company, beginning in 2002. Defendant comes from a close knit and supportive family. Defendant has a twelve-year-old son, is engaged to be married and plans to live with his fiancée and their son.

3

The offense giving rise to this action is Defendant's first criminal conviction. At the time of sentencing, Defendant advised the Court that in November of 2015, his mother was diagnosed with terminal lung cancer. Defendant was devastated and took a medical leave of absence from Ford Motor Company in order to help care for his mother, whose condition deteriorated swiftly. Defendant maintains that he engaged in the large-scale cocaine trafficking in order to make money for his mother's and son's care.

Defendant suffers from Type II diabetes and severe obesity with a Body Mass Index (BMI) of 34.5. Defendant was officially diagnosed with Type II diabetes in 2015. However, his symptoms began to appear in 2013. Since his diagnosis, Defendant has controlled his condition with diet and exercise rather than medication or insulin, even though medical professionals have advised that he consider medication to lower his A1C.

In addition to his underlying medical conditions, Defendant bases his present motion on COVID-19, a respiratory illness that spreads easily with symptoms ranging from mild for people at low risk to severe with respiratory failure and death in older patients and patients with chronic underlying diseases, including severe obesity and diabetes. Defendant is serving his sentence at FCI Elkton, a BOP facility that has been the epicenter of a major outbreak of the virus – 46% of

4

its inmate population, or nearly 1,000 inmates, have tested positive for COVID-19 and 9 inmates have died.  *See* https://www.bop.gov/coronavirus/.

During the nearly two years Defendant was on bond, he successfully complied with all of the conditions of his release.  His records from the BOP show that he has adjusted well and taken several courses including foreign exchange trading, business startup, and health awareness.  Defendant has had no disciplinary actions against him and "has maintained clean conduct while at FCI Elkton."  ECF No. 134-2, PageID.1337.  Defendant works as a unit orderly and the BOP reports that he "consistently earned average and above average work evaluations."  *Id.*

The BOP has completed a risk assessment for Defendant and categorized him as minimum risk.  On November 12, 2019, the BOP requested that Defendant be transferred from FCI Elkton to FCI McKean's satellite camp[1] because Defendant is "not considered a management problem," and BOP staff "believe he no longer requires the security constraints presented in an FCI." ECF No. 134-3, PageID.1339.  Defendant is still awaiting transfer to the satellite camp at FCI McKean.  The BOP has also found Defendant to be eligible under the First Step Act and that his recidivism risk level is minimum.  ECF No. 134-4, PageID.1340.

---

[1] A review of the BOP's website reveals that there have been no positive COVID-19 cases at FCI McKean with 116 tests administered to date.  *See* https://www.bop.gov/coronavirus/.

## III.   LAW & ANALYSIS

### A.  Legal Standard

Title 18 U.S.C. § 3582(c)(1)(A) governs this Court's authority to grant motions for compassionate release.  A sentencing court may reduce a term of imprisonment under § 3582(c)(1)(A) if the defendant has exhausted his administrative remedies, and after reviewing the § 3553 factors, it finds "extraordinary and compelling reasons warrant such a reduction," and that such reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).  In order for a sentence reduction to be consistent with applicable policy, a defendant must "not [be] a danger to the safety of any other person or to the community" under 18 U.S.C. § 3142(g).  U.S.S.G. § 1B1.13(2).

A defendant's medical condition is an "extraordinary and compelling reason" if the defendant is:

(I)     suffering from a serious physical or medical condition,
(II)    suffering from a serious functional or cognitive impairment, or
(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, & cmt. 1(A)(ii).

6

**B. Exhaustion**

A district court may not act on a motion for compassionate release unless the Defendant "has fully exhausted all administrative rights to appeal" the BOP's failure to file a motion for compassionate release on behalf of the Defendant or has waited "30 days from the receipt of such request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). In *Alam*, the Sixth Circuit held that while the exhaustion requirement is mandatory, it does not implicate the Court's subject matter jurisdiction. *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). As such, the exhaustion requirement is a mandatory claim processing rule, that "must be enforced" when "properly invoked." *Id.* (citing *Hamer v. Neighborhood Hous. Servs. Of Chi.*, 138 S.Ct. 13, 17 (2017)). There are "exceptions to mandatory claim-processing rules[,]" including "waiver" and "forfeiture." *Id*. at 834; *see also United States v. Barnes*, No. 3:13-cr-117, 2020 U.S. Dist. LEXIS 118828, *8 (E.D. Tenn. Jul. 7, 2020)("Mandatory claim-processing rules are only mandatory 'in the sense that a court must enforce the rule if a party 'properly raises' it.")(quoting *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849 (2019)).

Defendant maintains that he has satisfied the exhaustion requirement because he requested a reduction in sentence from the Warden at FCI Elkton on May 14, 2020, and the Warden denied his request on May 22, 2020. Defendant

filed his present motion on May 28, 2020.  In its Response, the Government does not argue Defendant has failed to satisfy § 3582(c)(1)(A)'s exhaustion requirement.

While Defendant submitted a request for compassionate release, and received a denial from the warden, he has not fully exhausted all administrative rights within the meaning of § 3582(c)(1)(A).  Once Defendant received a denial from the Warden, he still had administrative rights available to appeal the Warden's denial.  *See* 28 C.F.R. § 542.15(a).  Specifically, "[a]n inmate who is not satisfied with the Warden's response may submit an Appeal . . . to the appropriate Regional Director within 20 calendar days." *Id*. If an inmate is dissatisfied with the Regional Director's response, the inmate may submit an appeal to the General Counsel within 30 days of the Regional Director's response.  *Id*.  A denial by the General Counsel constitutes a final administrative decision.  28 C.F.R. § 571.63(b).

Here, Defendant failed to wait 30 days after the Warden's receipt of his May 14, 2020 request before he filed his motion with the Court. Nor did Defendant pursue his available administrative appeals all the way to the General Counsel as provided by 28 C.F.R. § 571.63(b) and 28 C.F.R. § 542.15(a).  Thus, he has not satisfied § 3582(c)(1)(A)'s exhaustion requirement.   However, because the Government has waived objection to the Defendant's motion on exhaustion

grounds, the Court may consider Defendant's present motion on the merits. *Alam*, 960 F.3d at 832; *Barnes*, 2020 U.S. Dist. LEXIS 118828, at *8.

### C. Extraordinary and Compelling Reasons

Defendant argues that his medical conditions and place of confinement place him at increased risk of death or serious illness from COVID-19 and amount to "extraordinary and compelling" reasons supporting his request for compassionate release. The Government does not contest Defendant's satisfaction of § 3582(c)(1)(A)'s "extraordinary and compelling" requirement. *See* ECF No. 132, PageID.1139 ("[U]nder the current conditions caused by COVID-19, Jenkins's diabetes and obesity satisfies the first eligibility threshold as [sic] is an 'extraordinary and compelling' reason for compassionate release during the pandemic.") (citing U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A)).

Defendant suffers from two conditions recognized by the CDC as increasing the risk for serious illness or death if exposed to COVID-19. He has been able to manage his diabetic condition through diet and exercise, however since the pandemic and changes at the BOP, he argues he has been unable to appropriately exercise and diet. He reports weight gain and experiencing the same symptoms as he did when his sugar levels and diabetes were not well-controlled. Courts have recognized that a diabetes diagnosis increases the risk of serious complications or

death from COVID-19 and have granted compassionate release to inmates suffering from the disease. *See Howard v. United States*, No. 16-cr-20222, 2020 U.S. Dist. LEXIS 90130, *8-9 (E.D. Mich. May 22, 2020) (granting compassionate release to inmate suffering from diabetes, hypertension and asthma); *United States v. Colvin*, No. 3:19-cr-179, 2020 U.S. Dist. LEXIS 57962, *8-9 (D. Conn. Apr. 2, 2020) (finding extraordinary and compelling reasons where the defendant suffered from "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19.").

Additionally, Defendant's BMI of 34.5 exposes him to severe risk even though he is not in an older age category. Research has shown that individuals who are less than 60 but have a BMI of 30 to 34 are twice as likely to need acute medical care related to COVID-19 than those with a BMI that is less than 30. *See* Jennifer Lighter *et al.*, *Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, Clinical Infectious Diseases (2020), https://perma.cc/LP4H-V3F4. In fact, obesity is one of the most serious risk factors for younger individuals admitted to the hospital as a result of COVID-19. *See* David A. Kass et al., *Obesity could shift severe COVID-19 disease to younger ages*, The Lancet (May 16, 2020), https://perma.cc/5HFW-89TA. Moreover, "[a] greater number of comorbidities also correlated with poorer clinical outcomes" with

hypertension followed by diabetes as the most common comorbidity. *Howard*, 2020 U.S. Dist. LEXIS 90130, at *8-9 (citing Wei-ji Guan et al., *Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis*, 55 EUROPEAN RESPIRATORY J. (2020)). *Id.*

Defendant argues that FCI Elkton is a dangerous facility that cannot control the spread of the virus, 8% of all federal inmate deaths have occurred at FCI Elkton even though the prison houses less than 2% of the entire prison population. FCI Elkton's architectural design with its dormitory style housing and 2,000 plus inmate population have both played a major part in the facility's inability to stop the spread of the virus. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) ("The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing . . . and the medically vulnerable subclass's health risks, presents a substantial risk that [the subclass] at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death.").

Defendant also asserts the prison is still not engaging in best practices to stem the spread of the virus. For instance, he reports that his cellmate contracted COVID-19 and there continues to be constant movement within the facility.

Defendant's unit has changed three times and there is a continuous influx of inmates in each unit.

The Government acknowledges that FCI Elkton "has suffered one of the most serious outbreaks of COVID-19 among BOP facilities[,]" however, it argues "the situation at FCI Elkton has improved significantly." ECF No. 132, PageID.1135.  The BOP website indicates that currently 8 inmates and 2 staff at FCI Elkton have a positive COVID-19 diagnosis and 978 inmates have recovered. There have been no inmate deaths at the facility in over two months, and all inmates at the facility have been tested, including Defendant. Defendant has received two tests, and both were negative for the virus.

Here, the Court concludes Defendant has established "extraordinary and compelling" reasons to support his request for compassionate release.  Defendant's heightened risk for severe illness and death from COVID-19 as a result of his comorbidities of severe obesity and diabetes, combined with the valid threat of contracting COVID-19 at FCI Elkton qualify as extraordinary and compelling reasons.  Courts in this and other districts have found that serious medical conditions combined with an inability to comply with social distancing diminishes an inmate's ability to engage in self-care within the facility.  *See United States v. Reddy*, No. 13-cr-20358, 2020 U.S. Dist. LEXIS 82208, *18 (E.D. Mich. May 11,

2020) (finding "extraordinary and compelling" reasons existed for inmate suffering from "diabetes and hypertension" which causes a heightened risk of severe medical consequences or death if she contracts COVID-19); *United States v. Rountree*, No. 1:12-CR-0308,  2020 U.S. Dist. LEXIS 91064, at *7 (N.D.N.Y. May 18, 2020) ("[I]n line with numerous other courts to have considered the issue, the Court finds that Rountree's diabetes and hypertension in the face of the COVID-19 pandemic, satisfies either § 1B1.13's specific 'medical condition' provision or its 'catchall' provision."); *United States v. Oliver*, No. 2:17-cr-20489, 2020 U.S. Dist. LEXIS 92939, *18 (E.D. Mich. May 28, 2020) ("Oliver's asthma and severe obesity plausibly fit within the Sentencing Commission's definition of 'extraordinary and compelling reasons.'"); *Colvin*, 2020 U.S. Dist. LEXIS 57962, at *9 (finding extraordinary and compelling reasons based on the defendant's diabetes).

The risk presented by Defendant's medical conditions is increased by the fact that his place of confinement is unable to stop the spread of COVID-19 in the facility. "Several courts have found an 'extraordinary and compelling reason' supporting release on the basis of a combination of dire prison conditions and underlying health conditions that increase the likelihood of severe illness from COVID-19." *United States v. Goins*, No. 11-cr-20376, 2020 U.S. Dist. LEXIS 100358, *15 (E.D. Mich. Jun. 9, 2020) (quoting *United States v. Bass*, No. 10-cr-166, 2020 WL 2831851, *7 (N.D.N.Y. May 27, 2020)).  In *Goins*, the Court found

extraordinary and compelling reasons existed for an FCI Elkton inmate who used a corticosteroid and had hypertension because "[t]he continued presence of the virus at the facility suggests it presents an ongoing risk, especially to vulnerable prisoners like Goins." *Id.*; *see also United States v. Jackson*, No. 2:18-cr-86-PPS, 2020 U.S. Dist. LEXIS 108255 (N.D. Ind. Jun. 19, 2020) (finding extraordinary and compelling reasons based on hypertension, morbid obesity, and bronchitis and the "continued and widespread presence of COVID-19 in FCI Elkton . . . with its open, dormitory-style" housing.)

While "[t]he BOP's steps to prevent and mitigate COVID-19 spread at Elkton are likely reasonable responses[,]" *Wilson*, 961 F.3d at 844, the record evidences an apparent inability to stop the virus's spread due to architectural design and a 2,000 plus inmate population rendering Elkton ill-suited for necessary safety precautions such as social distancing. Confinement at FCI Elkton likely "presents a substantial risk" that the medically vulnerable subclass in *Wilson*, of which Defendant is a member, "will be infected with COVID-19 and have serious health effects as a result, including, and up to, death." *Id.* at 840. Finally, the Court notes that, at first glance, the positive COVID-19 cases appear to have gone down at FCI Elkton, however it is likewise apparent that continuous testing has slowed down and may have stalled altogether. *See* https://www.bop.gov/coronavirus/. The Government has argued that FCI Elkton

has tested every single inmate, however the prison lists 2,147 total inmates and reports administering 2,149 tests to date.  *Id.*

Moreover, Columbiana County, where Elkton is located, is experiencing an increase in positive COVID-19 cases and has "the ninth-highest new cases per capita of Ohio's 88 counties."  *See* www.mahoningmatters.com, *Columbiana County Expected to Return to Level 2 on State COVID-19 map*, Aug. 12, 2020. With the virus still plaguing the surrounding communities, it is highly likely that it will continue to enter the facility. *See United States v. Massingille*, No. 16-cr-20193, 2020 U.S. Dist. LEXIS 141365, *18 (E.D. Mich. Aug. 7, 2020) ("Given that the staff of FCI Morgantown must necessarily circulate in a community that has been hit hard by the virus, there is an appreciable risk that additional staff will become infected and will transmit the virus to the prisoners.").  This circumstance, coupled with an apparent slowdown in testing leads the Court to conclude the threat from COVID-19 has not been eradicated at FCI Elkton.  *See United States v. Amarrah*, No. 17-20464, 2020 U.S. Dist. LEXIS 80396, *19 (finding that no weight should be given to the Government's "zero confirmed COVID-19 cases statistic" where the Government failed to provide information concerning "current testing practices[.]")

Based on the foregoing, the Court concludes that Defendant has established § 3582(c)(1)(A)(i)'s "extraordinary and compelling" requirement.

### D. Danger to the Community and § 3553 factors

Even where a court finds that extraordinary and compelling reasons exist warranting a sentence reduction, the court may not grant compassionate release unless it considers the reduction in sentence in light of the sentencing factors contained in 18 U.S.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A). The Court must determine that a sentence reduction is warranted under the § 3553(a) factors, as well as find the defendant is not "a danger to the safety of any other person or the community[.]" *Id*.; U.S.S.G. §1B1.13.  The § 3553(a) factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect deterrence goals, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).  The Government argues Defendant is a danger to the community and the § 3553(a) factors weigh against compassionate release.

Defendant's offense is without question extremely serious.  Defendant had a direct connection to a source in Mexico and negotiated prices and obtained 72 kilograms of cocaine, 48 of which ended up on the streets and in the Eastern District of Michigan's communities. This Court noted the seriousness of Defendant's offense at the time of sentencing, "[d]rugs have . . . been a real devastation on our community."  ECF 109, PageID.843-45).  Moreover, Defendant

has admitted that his drug trafficking was not limited to the 72 kilograms of cocaine he conspired to distribute in late 2015 and early 2016 and that he has been involved with other drug trafficking transactions.  Additionally, Defendant was in possession of a loaded firearm at the time of his arrest.

Defendant has positive attributes which undermine a finding of dangerousness, including Defendant's lack of a criminal history, strong family relationships and support, compliance with the conditions of bond, good conduct while in confinement, and the BOP's minimum risk of recidivism finding.  The BOP's decision to transfer Defendant to FCI McKean's lower-security, satellite camp also supports a finding that Defendant is not a danger under § 3582(c)(1)(A).

However, Defendant has served less than three years of his 13-year sentence, or less than a quarter of his sentence.  A reduction in sentence would not promote respect for the law and the seriousness of his offense.  A judge in this district has held in another drug-trafficking case, "[g]ranting [the defendant] compassionate release and reducing his sentence to time served when he has served less than a third of an approximately nine-year sentence would lead to unwarranted sentencing disparities and improperly minimize the serious nature of his drug trafficking offense."  *United States v. Brant*, No. 2:18-CR-20155, 2020 U.S. Dist. LEXIS 116428 (E.D. Mich. Jul. 2, 2020).  A reduction in Defendant's sentence would

similarly result in sentencing disparities and improperly minimize the serious nature of Defendant's offense.

Additionally, Defendant's release plan appears to be consistent with his past routine, which did not prevent him from trafficking large amounts of cocaine that was eventually dispersed into the Eastern District of Michigan's communities to wreak havoc therein. Based on all of these considerations, the Court concludes that Defendant is a danger to the community and the § 3553(a) factors do not support a reduction in sentence. Defendant is therefore not eligible for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

The Court has not ignored the *Wilson* court's holding that the spread of COVID-19 at FCI Elkton and Defendant's particular medical conditions likely pose a serious risk of harm to Defendant. *See Wilson*, 961 F.3d at 840. However, based on the above considerations, Defendant is not a good candidate for a reduction in sentence under § 3582(c)(1)(A). While transferring Defendant to the satellite camp at FCI McKean, which has never had any positive COVID-19 cases, may provide a solution, this Court is without authority, nor would it be prudent for this Court to order the BOP to expedite Defendant's transfer or otherwise interfere with Defendant's custody when such decisions are contingent on a host of considerations best left to the BOP. *United States v. James*, 244 F. Supp.2d 817,

819-20 (E.D. Mich. 2003) ("It is well established that Congress has given the Bureau of Prisons, and not the federal courts, the exclusive authority to decide where federal prisoners will serve terms of imprisonment.") (citing 18 U.S.C. § 3621(b)).

## IV.   CONCLUSION

Accordingly, for the reasons stated above, Defendant's Motion for Compassionate Release [#122] is DENIED.

SO ORDERED.

Dated:  August 14, 2020                         /s/Gershwin A. Drain
                                                GERSHWIN A. DRAIN
                                                United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 14, 2020, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager